JACOB STINER and others *vs.* JOSEPH STINER and others.

The only ground upon which it can be held that a party obtaining a convey-
ance or lease of land may be compelled to hold the same as trustee for
another, is where such party stood in a confidential relation to the other and
has used such relation to his own advantage.

Where no fraud is shown, in fact, and no relation exists between the parties in
which either owes a duty to the other, and no breach of trust or confidence
is shown, whatever advantage one may gain over the other by a sharp bar-
gain, or an over-bidding against him, cannot be interfered with.

If a fraud is practiced upon a landlord, by one desirous of obtaining a lease of
premises from him, the lessor may in equity set aside the contract; but no
such right accrues to another person from the fact that he also was desirous
of obtaining a lease of the same premises, and had applied for one, but had
made no agreement therefor, and that the other obtained the same by taking
advantage of the lessor's mistaking the lessee for him.

Under such circumstances, the party obtaining the lease owes the other no
duty, and the latter has acquired no right to a lease; and between them
there is no relation of confidence which can create the obligations that arise
from a trust. Hence there is no principle of equity which will allow the
court to adjudge the lessee to stand in the relation of trustee to him; even
though in negotiating for such lease, the lessee concealed the fact that he did
not represent the other party, with whom the lessor supposed himself to be
dealing. CARDOZO, J., dissented.

Where, in an action against a lessee, for fraud in obtaining a lease, which the
plaintiffs were anxious to procure for themselves, the finding of the court,
upon conflicting evidence, was that the defendant did not intentionally or
fraudulently divert the lease from the plaintiffs; nor did he know, prior to
its execution, that the lessor meant it to be a lease to the plaintiffs; nor
did he in any way fraudulently suppress the truth, in the premises; *Held*
that this finding was conclusive upon the question of fraud.

APPEAL from a judgment ordered at a special term, in
equity, dismissing the complaint, with costs.

The complaint, in substance, avers that the plaintiffs are
partners, in the city of New York, as dealers in teas and
coffees, under the firm name of "J. Stiner & Co.," and
that they conduct their business under the style of the
"New York and China Tea Company," their principal
warehouse being at No. 49 Vesey street, in said city. That
the defendant Joseph Stiner is proprietor of various branch
stores in said city, his principal warehouse being at No. 51

Vesey street, called "Joseph Stiner's Vesey Street Tea Warehouse." The complaint also avers that the defendants Wm. E. Hasbrouck and Thomas H. Roe, had power, as agents for the owners thereof, to lease the store No. 204 Greenwich street; that the plaintiffs applied to them at Newburg, for a lease thereof, about January 24, 1868, at the same time delivering to them their business card, describing their firm as "J. Stiner & Co.," No. 49 Vesey street. That these agents said they had not determined whether they would lease said premises to any person other than the then occupant thereof, one Worley, but would call on the plaintiffs during the following week, and let them know. That the said agents did, in pursuance of said promise, visit said city, and by mistake entered the store of the defendant Joseph Stiner, adjoining, who, falsely and fraudulently keeping them under the impression that they were dealing with the plaintiffs, persuaded the owners of said store, No. 204 Greenwich street, to give to the said Joseph Stiner a lease thereof for the term of five years, from May 1, 1868. The complaint also avers, that in obtaining this he falsely, fraudulently and maliciously personated and assumed to act for the plaintiffs' said firm; that the delivery to him of said lease was the result of error and mistake on the part of the lessors; that the good will of said lease is worth some $10,000. The prayer of the complaint is, either that the said lease be declared to have been executed for the benefit of the plaintiffs, and that it be assigned to them, or that it be canceled, and another and similar lease be executed to the plaintiffs.

The answer of Joseph Stiner expressly denies all knowledge of any prior negotiation for a lease of said store, by or on behalf of the plaintiffs; utterly denies that he personated or assumed to act for them, and avers that it was obtained by him in good faith, and without knowledge of any claim or pretended claim of the plaintiffs thereto.

The answers of the other defendants make substantially

the same averments, with others which it is unnecessary particularly to refer to.

The action was tried at a special term, before a justice of this court, without a jury, as an equity cause, in March, 1869.

The following facts were found by said justice.

*First.* That the defendant, Joseph Stiner, prior to May, 1860, carried on the business of buying and selling teas, coffees and sugars, in the city of New York, and during that month took Jacob Stiner, one of the plaintiffs, in business as a partner with him, when the firm name became "J. Stiner & Co.," and after the subsequent introduction of Philip Stiner into the business, the firm continued until January, 1867, when they dissolved their business connections, Joseph retiring from the firm; the stock in trade, fixtures and stores, several in number, were divided between them, the plaintiff Jacob retaining the stores 47 and 49 Vesey street.

*Second.* That after the dissolution the defendant Joseph purchased the lease and good will of the store 51 Vesey street, with the fixtures, for the purpose of carrying on the same kind of business which he has continued there, and at his seventeen other stores in the city hitherto.

*Third.* That at the time of the commencement of this action, the plaintiffs were partners in business as dealers in teas, coffees and sugars, under the name and firm of "J. Stiner & Co.," and that their principal warehouse, from the time aforesaid until the present time, has been at No. 49 Vesey street aforesaid.

*Fourth.* That at the time of said dissolution there was no understanding or agreement between the parties to such dissolution, that Joseph should not set up a store in the vicinity of, or in opposition to, the plaintiffs.

*Fifth.* That the store No. 204 Greenwich street, being the one in controversy, and forming the southwest corner of Greenwich and Vesey streets, and being a desirable

location for the business, was sought after by both parties; the defendant Joseph, during the latter part of the year 1867, endeavoring to discover the owner; that he searched the tax books, where they were assessed to Poe, instead of to Roe, the real owner, and Joseph was unable to procure a lease until after the 29th January, 1868, on which day he learned who the owners were.

*Sixth.* That prior to the 29th day of January, 1868, the plaintiffs also had made some exertions to ascertain the names of the owners of the premises No. 204 Greenwich street aforesaid, and upon learning their names and residence, Mr. Moses, one of the plaintiffs, on or about the 29th day of January, 1868, went to Newburg, where the lessors and their agents resided, and saw Mr. William C. Hasbrouck, one of the defendants, who referred him to Mr. Roe; that he inquired of them, separately, who were the owners of said premises, and whether they could lease the same from May 1, 1868, said Moses saying " J. Stiner & Co.," No. 49 Vesey street, New York city, were desirous of leasing the same for a tea store for a term of years from May 1, 1868, and if said " J. Stiner & Co." could obtain such lease, they would pay a liberal rent for said premises, and make improvements thereon at their own cost and expense, the same being greatly dilapidated and in need of extensive repairs and improvements; that such agents, Roe and Hasbrouck, separately informed Moses that they could not enter into any negotiation for the lease of said premises to any person without first seeing Mr. Worley, the then tenant of said premises, and offering him a new lease thereof; that they would probably be in New York city on or before the 1st day of February, 1868, about leasing said premises, and would then try and call upon " J. Stiner & Co." about the matter; that Moses left J. Stiner & Co.'s card with Mr. Roe; that he did not apply for a lease for any definite term; that no rent was mentioned nor agreed upon; that no sum was mentioned as

the amount of improvements; that no note or memorandum in writing of any kind or nature was made or signed; that neither Roe nor Hasbrouck promised in any way or manner, when Mr. Moses was at Newburg, to let the store to the plaintiffs if they concluded not to rent it to the tenant Worley.

*Seventh.* That Messrs. Roe and Hasbrouck, who were the duly authorized agents to rent said premises, on the 29th day of January, 1868, left Newburg and came to the city of New York, for the purpose of negotiating, on behalf of the owners of said premises, a lease thereof from May 1, 1868; that they first called at No. 204 Greenwich street aforesaid, to see Mr. Worley, the then tenant, and to give him an opportunity of re-leasing them, and not finding him there, went immediately thence to call at No. 49 Vesey street aforesaid, to see said J. Stiner & Co. about negotiating a lease of said premises; that by mistake they went into No. 51 Vesey street (Joseph's store) instead of into store No. 49, belonging to the plaintiffs; Joseph's store, No. 51, is west of the plaintiffs', and between it and No. 204 Greenwich street; that Roe and Hasbrouck, instead of passing No. 51, went into it, intending to go into No. 49, although 51 had painted upon it, in large letters, in several places, "Joseph Stiner;" that, being thus in No. 51, they inquired of a clerk therein, for Mr. Stiner, and they were told he was not there, but was at his store No. 6 Fulton street; that they went there, and inquired for Mr. Stiner, and were introduced to the defendant Joseph; they told him they had come from Newburg that day for the purpose of negotiating a lease of No. 204 Greenwich street; that they had that day previously called at No. 204 Greenwich street, to see the then tenant, Mr. Worley, and give him the opportunity of taking a new lease thereof from the 1st of May, 1868, and had not been able to see said Worley; that they then informed Joseph that at Newburg, some few days before January 29, 1868,

they had been applied to for a lease of said premises for a tea store; that thereupon they told Joseph that he was not the person who had called on them, at Newburg, and he replied that he was not; that he carried on business on his own account, but that he knew the premises, and wanted to lease the same for a tea store; that they, supposing and believing said Joseph Stiner was the person, or one of the persons, on whose behalf said Moses had applied to them, as aforesaid, and having ascertained upon inquiry that he was a responsible man, and would make a good tenant, they informed him they would lease said premises to him for the time and on the terms contained in the lease dated January 31, 1868, subsequently made by the owners of said premises to him, but before consummating said lease they would make further efforts to see said Worley, and give him an opportunity of re-leasing said premises; that Joseph Stiner assented to take a lease of said premises for the time and on the terms and conditions above mentioned; and that it was then and there agreed, between said Joseph and Roe and Hasbrouck, that the latter should have till three o'clock in the afternoon of January 29, 1868, to make further efforts to see said Worley, and, if possible, give him an opportunity of re-leasing said premises; that Roe and Hasbrouck thereupon made every possible effort to find said Worley before three o'clock in the afternoon of the last mentioned day, without success, and at that time advised said Joseph Stiner that he could have a lease of said premises for the term and on the conditions proposed; that accordingly said lease to him, dated as aforesaid, between the owners of said premises as lessors, and him as lessee, in duplicate, was duly executed, stamped, and delivered on the said 31st day of January, 1868, Joseph Stiner having come to Newburg for the purpose of obtaining said lease.

*Eighth.* That the lease in question was executed and delivered to said Joseph Stiner under the impression and

belief, on the part of the landlords, (resulting solely from the mistake on their part in going into No. 51 instead of into No. 49,) that it was to and for the benefit of the person or persons on whose behalf Mr. Moses had called on them at Newburg, and that the contrary was not discovered by the landlords, or their agents, until some time thereafter, and then through the instrumentality of the plaintiffs; that when the said mistake was so discovered, Roe and Hasbrouck, believing that but for such mistake the lessors probably would have made a lease to the plaintiffs similar in all respects to the one given to Joseph, expressed to the plaintiffs a willingness on the part of the owners, if Joseph would surrender said lease, to execute and deliver a similar one to the plaintiffs, but said owners and agents at the same time and ever since have claimed that the owners were never legally nor honorably bound to execute and deliver to the plaintiffs such a lease, or any lease whatever, of said premises; and that they were, and always have been unwilling, by their acts, to annul, or to claim legally a cancellation of the said lease; and that the said owners and lessors, and their said agents, after the mistake aforesaid was discovered, and with full knowledge thereof, and before the commencement of this action, in all things ratified and confirmed the said lease to Joseph, and always have been and are now unwilling to annul or cancel the same; that they have received the rent from Joseph, and have in all respects recognized him as their tenant, refusing to receive rent for the said premises from the plaintiffs, and refusing to recognize them in any way or manner, always claiming and insisting that the same was a valid and binding lease between the parties thereto, and in no way tainted by fraud.

*Ninth.* That there is not the slightest personal resemblance between Mr. Moses and the defendant Joseph Stiner, and it is impossible, with ordinary attention, to mistake the one for the other; that the agents for the

landlords aforesaid, when they came to New York, January 29, 1868, were personally unacquainted with the defendant Joseph, never having seen him before that day, and knew none of the plaintiffs except Mr. Moses; that at the time of negotiating for and accepting the lease in question, Joseph Stiner was wholly ignorant of the fact that Mr. Moses had been to Newburg, or that the plaintiffs had in any way been in treaty for the store, or that Roe and Hasbrouck were in pursuit of the plaintiffs or of any of them; that Roe and Hasbrouck gave him no such information; that Joseph, never in any way or manner, personated the plaintiffs, or any of them; that he never in any way or manner assumed to act for the plaintiffs or on their behalf, or in their interest; that he neither said nor did anything at any time to induce the landlords or their agents to suppose or believe that he was one of the plaintiffs, or that he could do the business for them, or that he was the person or one of the persons on whose behalf Mr. Moses had called at Newburg; that Joseph was not guilty of any fraud whatever, either upon the landlords or the plaintiffs, in negotiating and accepting the lease in question; that he did not mean to perpetrate any fraud whatever; that he did not know Roe and Hasbrouck were in pursuit of a Mr. Stiner, who wanted the premises for a tea store; that he did not know that Roe and Hasbrouck were in pursuit of the plaintiffs or any of them; that Joseph did not, by act or word, lead Roe or Hasbrouck into the belief that he was one of the plaintiffs, or that the negotiations with them for the lease would enure to, or was for the benefit of, the plaintiffs; that he was and is in the habit of hiring many stores in his business; that he were at this time frequently called upon by persons having property to rent, and that he hired the store in controversy in the usual and customary way.

*Tenth.* That Joseph did not intentionally or fraudulently divert the lease from the plaintiffs, or prevent its being

executed to them; nor did he at any time know, prior to its execution, that the landlords meant or understood it to be a lease to the plaintiffs, nor did he in any way or manner fraudulently or otherwise suppress the truth in the premises.

*Eleventh.* That Mr. Roe, in the interview with Mr. Moses on January 24, 1868, was not in any way given to understand that the plaintiffs were willing to make terms with the landlords as favorable to the latter as could be obtained from any other applicants or tenants.

*Twelfth.* That on or about February 24, 1868, the plaintiffs requested from Joseph Stiner, in writing, a surrender of the lease in question, which he refused to make, by treating it with silent contempt; that the plaintiffs' offers to indemnify him against the lease were made in good faith, and that their responsibility for the performance of these offers is ample; that the plaintiffs first ascertained that Joseph had the lease in question about the middle of February, 1868.

*Thirteenth.* That the landlords have at all times been unwilling, by any act of theirs, to annul or cancel the lease in question, insisting before the commencement of this action, and ever since, that they were never legally or otherwise bound to execute a lease to the plaintiffs, and that the lease was a valid and binding one, without fraud; that the agents aforesaid, after the mistake was discovered, expressed, on behalf of the owners, a willingness on their part, if Joseph would surrender said lease, to execute a similar one to the plaintiffs, but the expression of such willingness on their part was accompanied by an express declaration that they were never legally bound to execute a similar or any lease whatever to the plaintiffs, and that they were unwilling by their act to annul or to claim legally a cancellation of the lease; that the owners have always insisted that the lease was a valid and binding one, throwing the responsibility of cancelling and surrender-

ing·the same upon Joseph, and always refusing to annul or cancel the same by any act of theirs.

Upon these facts, the conclusions of law were as follows:

1st. That no valid or binding agreement for a lease was ever made between the plaintiffs and the owners, or their agents.

·2d. That what was said and done at Newburg did not amount to an agreement for a lease, nor to a lease of the premises; because no rent, nor term, nor conditions, were definitely or clearly stated, ascertained, or agreed upon.

:3d. That Joseph, in negotiating and accepting the lease in question, acted solely on his own account, and on his own behalf, and not as the agent or trustee of the plaintiffs, and was not guilty of any fraudulent representation, concealment, or conduct whatever.

4th. That the mistake of the owners cannot be taken advantage of by the plaintiffs.

5th. That the refusal of the owners to cancel or annul the lease after discovering the mistake, operates as a ratification and confirmation thereof.

6th. That before and since the commencement of this action, the lease was in all things ratified and confirmed by the lessors, as a valid and binding lease between them and the defendant Joseph.

7th. That at the time of the execution and delivery thereof, the said lease was, and ever since has continued be, a valid and binding contract between the parties thereto, and that the plaintiffs never had any right, title, or interest in or to the same, or in or to the lease created thereby.

8th. That the defendants are entitled to judgment upon the whole case in their favor.

9th. That the defendant Joseph Stiner is entitled to his costs and disbursements in this action, as against the plaintiffs, to be taxed.

10th. That the other defendants are entitled to their

costs and disbursements, as against the plaintiffs, to be taxed.

11th. That judgment be entered against the plaintiffs, and in favor of the defendants, accordingly.

The plaintiffs excepted to the findings of fact and law in this action, and appealed from the judgment entered upon such findings.

*John Graham*, for the appellants.

I. The finding as matter of fact, that Joseph Stiner, prior to May 1860, carried on business (implying, alone) in teas, coffees and sugars, and during that month took Jacob Stiner as his partner, forming the firm of "J. Stiner & Co." has not a particle of evidence to sustain it. Such a finding might be injurious to Jacob Stiner, who really established the business in 1855, or about that time, and for years hired Joseph Stiner as a clerk. In a mercantile point of view, the reversal of this finding is important to Jacob Stiner, as the finding is certainly most unjust to him.

II. The opinion of Clerke, J., in pronouncing final judgment at the special term, does not acquit Joseph Stiner, altogether, but uses this language: " Whatever reason we may have to suspect that the defendant knew that the plaintiffs had commenced a negotiation with Hasbrouck and Roe for the lease, there is no evidence that he knew anything of it when these gentlemen called upon him; and in answer to a question put by me to Mr. Roe, he said that the defendant had said or done nothing at the time they called, to induce them to suppose that he represented the plaintiffs, or was acting on their behalf." This furnishes a part of the key to the reasons for the judgment against the plaintiffs. Though a court of equity may have every reason to suspect a fact, it cannot act so long as it does not positively know it. How much relief has such a court funished heretofore, upon the basis of reasonable, well founded suspicion ?

III. The opinion of Clerke, J. also contains the startling principle, that an individual can take advantage of another's mistake, knowingly and designedly, so long as he says or does nothing to produce it. It is hard to conceive what fraud is, if that is not fraud. That is certainly *suppressio veri.*

IV. The opinion altogether is rather a calumniatory opinion in favor of Joseph Stiner. It certainly does not say that his conduct was right in morals, or such as ought to have proceeded from an individual gifted with a delicate sense of honor.

V. It will be observed that the lessors do not, in their answer, either set up the statute of frauds as a bar to the enforcement of an oral understanding between them and the plaintiffs, or interpose any defense of any kind to prevent the lease being given to the plaintiffs. It is not disputed by them, 1st. That the plaintiffs first treated with them for the store; or, 2d. That they intended to call on the plaintiffs about it; or, 3d. That their transactions with Joseph Stiner commenced, and ended, in mistake. The case is virtually this : The plaintiffs went to great trouble and expense in discovering this store; they offered for it almost the very terms embodied in the lease in question; (if anything, better terms;) they are the parties the ground owners came to the city to negotiate with; and their not getting the store was the result of a mistake on the part of the owners, and of fraud on the part of Joseph Stiner. The question is not as it would have been if no lease had been executed. Under existing circumstances, all previous matters are shut out, except as throwing light upon the plaintiffs' right to claim the lease. The owners meant to give it to them. Shall this intention be frustrated, or not?

VI. Joseph Stiner cannot raise the defense of the statute of frauds. That is personal to the lessors. They do not rely on it.

VII. If the lessors were under no obligation to the plaintiffs to give the lease originally, their present status is decided by the actual execution of a lease, and the intention to give it to the plaintiffs. Having executed and delivered it, they cannot be heard to defeat their own intention in reference to it. If this lease was meant to be. to the plaintiffs, equity considers it was a lease to them.

VIII. The lease being intended for the plaintiffs, the court can take it from Joseph Stiner, first, either at the instance of the lessors; or, second, at the instance of the plaintiffs. It is property, and equitably the plaintiffs' property. It was made and delivered for their use and benefit. *Benton* v. *Pratt*, (2 *Wend.* 385,) furnishes a principle supporting this action. The doctrine of "implied trusts" is very ductile. The principle underlying it is capable of indefinite tension. (2 *Story's Eq. Jur.*, *by Redfield*, §§ 1263 *to* 1265.) He who prevents an act being done to another, fraudulently, and draws it to himself, is in equity a trustee. (1 *id.* § 439. *See also* §§ 437, 438.) Joseph Stiner having taken a lease, with notice of the plaintiffs' rights, and of the friendly relations of the lessors towards them, his act is affected by notice. (1 *id.* §§ 395,. 400.) The opinion of Cardozo, J., in granting the injunction order is a correct, practical application of the principles governing a court of equity in a case of this kind.

IX. If it be said that there was no contract between the plaintiffs and the lessors, for the lease; that there was no meeting of minds upon its terms, as between them; the answer is, that is unnecessary, either at law or in equity. At law, a party can affirm a tort, and make a contract. In equity, certain parties (such as *cestuis que trust*) can take the benefit of transactions they were not direct parties to, upon this principle of affirmance.

X. It cannot be said that Joseph Stiner acted in ignorance of the plaintiffs' rights. He was warned, in advance, that he was not the person who had been to Newburg. He

thus knew the lessors were not after him, but some one else. If he did not inquire into the circumstances, it was his own fault. He is to be held to know all that he could have learned from Messrs. Hasbrouck and Roe, if he had questioned them. This shows his fraud. His hostility to the plaintiffs confirms it.

XI. If Joseph Stiner had been a mere stranger, acting in good faith, uninformed that other parties were after the store, and that he was supposed to be one of them, his standing might be different. Can this court doubt that he knew with whom he was interfering? So the case would be altered if the lessors asserted that they gave out the lease to Joseph Stiner, in the independent exercise of their rights as owners, ignoring the plaintiffs and all the world.

XII. This action is not designed to undo the transaction in question, but to enforce it, as intended, in favor of the plaintiffs.

XIII. If a valuable consideration is needed to sustain the plaintiffs' claim, it can be found in the trouble and expense they incurred in endeavoring to secure the lease.

XIV. The plaintiffs offered to accept the lease in question before and at the time this action was brought, and to give all indemnity to Joseph Stiner, in the matter.

XV. The findings of fact and law, as excepted to by the plaintiffs, are erroneous, and contrary to evidence. The findings of fact and of law proposed by the plaintiffs should have been upheld, and the exceptions to the refusal to do so are well taken.

XVI. So far as the case is covered by the admissions of the answer of the landlords, (and in those respects it has never been combatted by Joseph Stiner,) it should be deemed conclusive upon the defense. It is seldom that a party receives a judgment based upon a fact not presented in, or covered by, his pleading. If this rule is applied to this controversy, the court is saved the trouble of wading through, and weighing the effect of, contradictory proof.

Stiner *v.* Stiner.

The statements of that answer, in this point of view, simply become a matter of construction or interpretation, so far as the facts involved in them are concerned. Coupling the fact they contain, that Messrs. Hasbrouck and Roe informed Joseph Stiner that they had been applied to at Newburg for a lease of the premises, a few days before; the remark they made to him, that he was not the person who had called upon them; his reply, that he was not; with the undisputed fact that the lease was given to him on the supposition that it was for the benefit of that person, and that the mistake of the landlords was not discovered until some thereafter, and then through the plaintiffs, how can the plaintiffs fail to have judgment in their favor? The pretense that he stated he did business on his own account, is met by the certainty that if he said that, the other fact, that there was a mistake on the part of the landlords, could not have existed. It is impossible those two things can be true. The issue is thus brought to this: if Joseph Stiner told Messrs. Roe and Hasbrouck he was acting for himself in getting the lease, and they gave it to him, they did it intentionally, and without mistake; if he did not tell them that, he fraudulently drew them into their mistake. If this be so, the law is perfectly plain. (1 *Story's Eq. Jur.* § 151, *Redf. ed.* 1866.)

XVII. The judgment in question should be reversed, with costs to the plaintiffs; and if an absolute judgment is not rendered in their favor, a new trial should be granted, with costs to abide the event.

*Ira Shafer* and *E. W. Stoughton*, for the respondents.

I. The plaintiffs are not entitled to the relief demanded, as against Roe and Hasbrouck, because of the following indisputable positions. There was no term agreed upon at Newburg; "five years or so" was talked of, says Moses. There was no rent agreed upon; "an increased rent" was

spoken of. There were no covenants or conditions agreed upon. There were no propositions of a precise or definite character, capable of ascertainment or enforcement, made by the plaintiffs or accepted by Roe and Hasbrouck. The plaintiffs and Roe and Hasbrouck talked upon the subject of renting the store, at Newburg, and the latter promised to call and see the plaintiffs when they came to New York, provided they concluded not to re-let to Worley. When they left Newburg they had not determined not to re-let to Worley, but, on the contrary, they determined to re-let to him, and called to see him in the morning. Failing to find him in, they again made efforts to see him, until 3 o'clock in the afternoon, for the purpose of re-letting the store to him. The defendants Roe and Hasbrouck insist, in their answer and evidence, that they were not legally or otherwise bound to let the store to the plaintiffs. The alleged lease between the lessors and Jacob is void, by the statute of frauds, being for "five years, or so," and "for a longer period than one year," * *. and there being no note in writing, expressing the consideration, subscribed by the parties. (2 *R. S.* 135, *marg. p.*, § 8.) It is void for uncertainty. "And if an agreement be so vague and indefinite that it does not show any mutuality in its terms, or that it is not possible to collect from it the full intention of the parties, it is void; for neither the court nor a jury can make an agreement for the parties. (*Chitty on Cont.* 65.) "Certainty as to the time when the term is to commence, its duration, and the amount of rent to be paid, is usually necessary to make an instrument operate as a present demise." (*Taylor's Landl. and Ten.* §§ 42, 70.) It does not amount even to the shadow of an agreement for a lease. "To constitute a valid agreement not under seal, there must be the mutual and definitive assent of both parties to the terms of the agreement." (*Chitty on Cont.* 64. *Jackson* v. *Delacroix*, 2 *Wend.* 433. *Taylor's Landl. and Ten.* § 42.) An

action for the breach of the alleged agreement would not lie. The plaintiffs could not compel the lessors specifically to perform. The contract of which performance is sought, must be clearly proved, and its terms should be so specific and distinct as to leave no reasonable doubt of their meaning. (2 *Pars. on Cont.* 513.) Thus equity will not enforce a mere voluntary contract; for it permits one to withhold what he has, of his own accord, and not from any benefit to himself, or expectation of any benefit, volunteered to promise. (*Id.* 517.) It must be "certain." (2 *Story's Eq. Jur.* § 751.) It must be clear, definite and unequivocal in all its terms. (*Id.* §§ 764, 767.) Nor could they maintain ejectment. (*Jackson* v. *Delacroix,* 2 *Wend.* 433.) The converse of these propositions would be true if Roe and Hasbrouck had been actors instead of defendants. There was not even a moral obligation existing on the part of Roe and Hasbrouck to rent the store to the plaintiffs. (2 *Pars. on Cont.* 517.) It would seem to follow, from these authorities, and the principles established by them, that the plaintiffs, as against Roe and Hasbrouck, and *vice versa,* are remediless.

II. Roe and Hasbrouck do not seek to annul or cancel the lease to Joseph; on the contrary thereof, they affirm it to have been made in good faith, without fraud on their or his part, and to be a valid, binding lease. They both swear they are unwilling to cancel it. They could not, if they desired to, rescind the contract. No fraud was practised upon them. They saw, inquired of, and knew, the man to whom they demised. He did not assume to represent or personate the plaintiffs. He truthfully answered every inquiry made of him. They make no complaint whatever. The plaintiffs have no right to say to Roe and Hasbrouck, "disaffirm this lease." The plaintiffs have no right even to say, "we stand in the lessors' shoes, and have their rights as against Joseph." The law, as well as "the plainest principles of honesty and equity," forbid

these plaintiffs coming into a court of equity and crying out against Joseph Stiner, "you have cheated Roe and Hasbrouck, and we will, although they do not, bring you to justice." The defendant was under no legal duty or obligation to the plaintiffs, whatever. 1. The relation of principal and agent did not exist, either by express contract or by implication. If Joseph's duty, as agent of the plaintiffs, was to hire the store for them, and he had taken the lease in his own name, he would have been guilty of a "plain fraud," of a "palpable fraud," and upon "the plainest principles of honesty and equity, he must be declared to be a trustee for the real owner." (*Story on Agency*, §§ 9, 210, 211.) Why? Because of "a confidence necessarily reposed in the agent, that he will act with a sole regard to the interests of his principal, as far as he lawfully may," (*id.* § 210;) and because of the rule, that "an agent employed to sell, cannot himself become the purchaser, and an agent employed to buy, cannot himself be the seller; so an agent employed to purchase, cannot purchase for himself, * * but he will be held as a quasi trustee." (§ 211.) *Parkist* v. *Alexander*, (1 *John. Ch.* 394, 396,) is an illustration of the doctrine. There "the intestate was intrusted by him (the plaintiff) with the agency of procuring a lease in fee of the premises, in the name of Alexander McKnight, and he promised to perform the trust. Instead of doing this, he afterwards purchased the equitable title of McKnight, and with the consent of McKnight, but without the knowledge or consent of the plaintiff, took the lease in his own name." * * "This, I think," said the chancellor, "cannot, and ought not to, be permitted. An agent, or trustee, undertaking a special business for another, cannot, on the subject of that trust, act for his own benefit, to the injury of his principal. This is a sound and fundamental rule of equitable policy." And upon this principle, *Brown* v. *Lynch*, (1 *Paige*, 147,) and kindred cases, were decided. Indeed, it may be laid

down as a general principle, that in all cases where a person is, either actively or constructively, an agent for other persons, all profits and advantages made by him in the business, beyond his ordinary compensation, are to be for the benefit of his employers. (*Story on Agency*, § 211. *Utica Ins. Co.* v. *Toledo Ins. Co.*, 17 *Barb.* 132. *Central Ins. Co.* v. *Protection Ins. Co.*, 14 *N. Y.* 85. *Conkey* v. *Bond*, 34 *Barb.* 276. *Torrey* v. *Bank of Orleans*, 9 *Paige*, 663.) 2. But the relation of principal and agent must have existed. (Same authorities.) 3. The defendant must have assumed some duty, trust or obligation, which he has violated and disregarded, before this doctrine can be applied to him. 4. There is no pretense that the plaintiffs were his principals for any purpose. 5. Nor is there any pretense that the defendant was their agent for any purpose. 6. Nor did he assume to act as agent for the plaintiffs, so as to enable them to adopt his unauthorized act; he acted for himself throughout, without their knowledge or consent, and without assuming to act for them. 7. Even the doctrine of ratification of unauthorized acts proceeds upon the assumption, (*a.*) That the relation of principal and agent existed. (*b.*) That the act performed had some relation to the general or special powers or duties of the agent, but in the particular instance was not binding for want of authority to the full extent of the thing done. (*Story on Agency*, §§ 239 *to* 260. *Dunl. Paley's Agency*, 171, *note* (0), 3*d Am. ed.*) (*c.*) An act performed by a person not the agent of another, in his own name, and for his own benefit, is incapable of adoption or ratification by another, as his act or deed, as has been repeatedly adjudged. Thus, in *Chanoine* v. *Fowler*, (3 *Wend.* 173,) the court held that notice of the non-acceptance of a bill of exchange cannot be given by a stranger, so as to enable the holder to avail himself of it. In the case of an insolvent vendee, a person without any authority from the vendor, stopped the goods *in transitu;* it was even doubted whether the subsequent

approval of the vendor made the stoppage *in transitu* good. (*Siffken* v. *Wray*, 6 *East*, 371, 380.) In *Bartram* v. *Fare-brother*, (4 *Bing.* 579,) where the attorney of an insolvent vendee had, upon his suggestion, and without instructions from the vendor, given notice to the wharfinger not to deliver goods, it was held that the subsequent ratification of the act by the vendor did not make it a valid stoppage. In *Doe* v. *Goodwin*, (5 *Ad. & Ell.*, *N. S.*, 143,) it was held that a notice to quit must be such that a tenant may safely act on it at the time of receiving it; and that a notice by an unauthorized agent cannot be made good by an adoption of it by the principal, after the proper time of giving it. (*See Dunl. Paley's Agency*, 345, 346.) The true rule is stated in *Wilson* v. *Tumman*, (6 *Man. & Gr.* 242,) thus: "That an act done for another by a person not assuming to act for himself, but for such other person, though without any precedent authority whatever, becomes the act of the principal, if subsequently ratified by him, is the known and well established rule of law." Here there is no pretense whatever, from the case, that Joseph assumed to act for the plaintiffs; but he assumed "to act for himself;" and here is the insurmountable difficulty with the plaintiffs' case.

III. Instead of the relation of principal and agent existing, and instead of the defendant assuming to act for the plaintiffs in any way or manner, we find: That the plaintiff Jacob, and the defendant Joseph, had been partners in the business in which they are still engaged. That they dissolved, long prior to the transactions in question. That they became warm and earnest rivals and competitors in business. That each regarded the other as unfriendly, if not enemies. That Jacob regarded Joseph's rivalry and competition as in violation of an understanding. Each one was anxious to secure the premises in question, and made efforts to ascertain the owners. The plaintiff succeeded in finding them; the defendant failed, because, in

the tax records, the name was written " Poe," instead of " Roe." It is idle, if not absurd, to say under these circumstances, that when Roe and Hasbrouck called on Joseph at his store, No. 6 Fulton street, he was under any duty, trust, or obligation whatever to the plaintiff. It is equally idle, under these circumstances, to say that Joseph acted, intended to, or assumed to act, for any one but himself.

V. Nor is there any valid pretense that he represented himself as the plaintiff; or that he personated the plaintiff. He did not know, nor did he have the least idea, so far as the case shows, that the plaintiffs had ever been in treaty for the premises. No such information was communicated to him by Roe and Hasbrouck. He made no misrepresentations of any kind or character, even according to the evidence as to the admission of Roe, " that they went right to No. 6 Fulton street, and asked for Mr. Stiner ; that Mr. Stiner, the defendant, came forward, and that he (Mr. Roe) said : ' Why, you are not the man we saw at Newburg. Is he in ?' That Mr. Stiner made some excuse, and said it was, or may have been his brother." Taking this version, which is denied by Roe, Hasbrouck, Joseph and Henriques, the defendant told the truth, aye, clearly informed Roe and Hasbrouck that it " may have been his brother." There is no pretense that Joseph knew who had been to Newburg ; there is no pretense that the plaintiffs had published what they knew and had done to the world ; at most, the defendant, upon their theory, suspected or believed that the plaintiffs had been in treaty with Roe and Hasbrouck for the store, and that they were in pursuit of them.

VI. We have some idea from the statute (2 *R. S.* 676, §§ 48, 49, 50,) as to what is intended or designed by falsely representing or personating another, and the charge that the defendant did either, is not only entirely unsupported by the case, but is ridiculous. How absurd it would be

to charge the defendant with the offense described in section 50: "Every person who shall falsely represent or personate another, and, in such assumed character, shall receive any money, value, or property of any description, intended to be delivered to the individual so personated, shall, upon conviction, be punished * * as for feloniously stealing the money or property so received."

VII. The defendant has not committed legal fraud; although it is not conceded he has been guilty of even a moral fraud. It has been shown that no legal right of the plaintiffs has been violated, and it follows that the plaintiffs have not, in law—in legal contemplation—sustained any damage. "And if no damage be caused by the fraud, no action lies." (2 *Pars. on Cont.* 269. 1 *Cowen's Treat.* 333. 2 *Kent's Com.* 480, 3*d ed.*) If the defendant has been guilty of moral fraud, the plaintiff is without remedy.

It is said we should have disclosed the fact that we were not "Stiner & Co." In *Keates* v. *Earl of Cadogan*, (10 *C. B.* 591; 70 *Eng. Com. Law R.*,) it was held "that there was no implied duty cast on the owner of a house being in a ruinous and unsafe condition, to inform a proposed tenant that it is unfit for habitation; nor will an action of deceit lie against him for omiting to disclose the fact." It is said that we have no right to remain silent. Such a doctrine has never been heard of. Why? Because of the settled doctrine, "If the seller (of goods) knows of a defect in his goods, which the buyer does not know, and if he had known, would not have bought the goods, and the seller is silent, and only silent, his silence is nevertheless a moral fraud, and ought, perhaps, on moral grounds, to avoid the transaction. But this moral fraud has not yet grown into a legal fraud. (1 *Pars. on Cont.* 461.) "Common honesty," as well as "morality," would require the purchaser of an estate to disclose to the seller his knowledge of the existence of a mine in the land of which he

knew the seller was ignorant; yet that great lawyer and judge, Lord Thurlow, thought that neither law nor equity, as administered in the tribunals of justice, required him so to do. (*Fox* v. *Mackrath*, 2 *Bro.* 240; *and see Lord Eldon's opinion in Turner* v. *Harvey, Jacobs' Rep.* 178.) If the plaintiffs' doctrine can be maintained, it would seem to follow: 1. That it is unsafe, indeed impossible, for a landlord to even talk with a person upon the subject of renting premises, without incurring a liability to rent. 2. That when a person desires to hire premises, and converses with the landlord upon the subject, he is thereby entitled to a lease of them. 3. And that a third person, who hires from the lessor, after this talk, does so at his peril; if he secures a lease, he holds it as trustee for the other party; and if he refuses to surrender it, he is liable to an action to compel him to do so.

And these same considerations are applicable to sales of real estate, personal property, and indeed to everything capable of being leased, sold and transferred, and it may be applied to all commercial transactions. If the lessors were seeking to annul this lease, they would be refused relief, because of this familiar principle of equity. Story says: "The rule as to ignorance or mistake of facts entitling the party to relief, has this important qualification, that the fact must be material to the act or contract, that is, that it must be essential to its character, and an efficient cause of its concoction." (1 *Story's Eq. Jur.* § 141, 3*d ed.*) Where the parties make just such instruments as they intend to make, they are not entitled to relief, (*Arthur* v. *Arthur*, 10 *Barb.* 9;) and that too, even though they mistake the law. *Pothier* (*on Obligations,*) tells us when a contract may be avoided when there has been a mistake as to the person. He says: "Here the question arises whether an error respecting the person with whom I contract annuls the agreement? This should be answered with a distinction. Wherever the consideration

Stiner *v.* Stiner.

of the person with whom I contract is an ingredient of the contract which I intend to make, an error respecting the person destroys any consent, and consequently annuls the agreement."

IV. Here there was no *suppressio veri.* There is no pretense that there was a misrepresentation, or *suggestio falsi.* As to the latter, see 1 *Story's Eq. Jur.* §§ 186, 193. Upon the other point, *suppressio veri, see* §§ 194–211. In *Robininson* v. *Justice,* (2 *Penn.* 19,) it is said that "silence will postpone a title only where silence was a fraud, and a fraudulent concealment of title could not be imputed to one who was ignorant that he had a title to conceal." By parity of reasoning it would seem to follow that it would be impossible for Joseph to be guilty of a fraudulent concealment of facts of which all hands agree he was ignorant.

INGRAHAM, P. J. The only ground upon which it can be held that a party obtaining a conveyance·or lease of land may be compelled to hold the same as trustee for another, is where such party stood in a confidential relation· to the other, and has used such relation to his own advantage. Wherever confidence exists, or is reposed, and one party has it in his power to sacrifice the interest of the party he is bound to protect, he will not be permitted to hold any advantage that he may have obtained personal to himself, to the injury of him to whom he owed a duty or trust. In such a case equity will compel him to give to the party injured the benefit he has obtained, even if no fraud is shown. But where no fraud is shown, in fact, and no relation exists between the parties in which either party owes a duty to the other, and no breach of trust or confidence is shown, then whatever advantage one man may gain over the other by a sharp bargain, or an over-bidding of another, cannot be interfered with.

If fraud was practiced in this case on Hasbrouck, the landlord, he might in equity have set aside the contract,

but no such right accrued to the plaintiff, from the fact that he wanted the lease in question, which the defendant obtained; even though he concealed the fact, that he did not represent the plaintiff in his negotiations. The defendants owed the plaintiffs no duty, the plaintiffs had acquired no right to the lease, and between them there was no relation of confidence, which could create the obligations that arise from such trusts.

In fact there was no right on the part of the plaintiff to the lease, either from Hasbrouck or the defendant. He had no claim to it, in any view of the case, and there is no principle of equity which would allow the court to adjudge the defendant to stand in the relation of trustee to the plaintiff.

As to the facts on which the plaintiffs allege fraud to have existed, as proved on their part, the defendants have given evidence denying such fraud, and it became a question for the decision of the court, whether any such fraud had been committed. Upon this point, the finding of the court is that the defendant did not intentionally or fraudulently divert the lease from the plaintiffs; nor did he know, prior to its execution, that the landlord meant it to be a lease to the plaintiffs; nor did he in any way fraudulently suppress the truth, in the premises. This finding is conclusive upon the question.

The exceptions as to the questions put to the witnesses, whether the defendant did acts to induce them to believe that he was the plaintiff, are not well taken. That inquiry was nothing more than to ask whether they did so believe from conduct which had been previously given in evidence; and a similar question to the defendant, whether he intended to personate the plaintiff, was admissible as to his intent. What he did do was fully in evidence, and inquiries as to the effect of these acts were not erroneous.

There is no good reason for interfering with the judgment appealed from.

GEO. G. BARNARD, J.   I know of no principle of equi-
table jurisprudence under which the plaintiffs are enti-
tled to a judgment, in this action.   The plaintiffs never
had any legal right to a lease from the owners of the
premises.   No terms of lease were ever agreed upon be-
tween the plaintiffs and the lessors.   No term, no rent;
no covenant of any kind; no promise for a lease at all.
There was simply an expression of a willingness to take a
lease if the parties to it could agree.   The owners were at
full liberty, so far as any evidence in the case discloses, to
refuse a lease to the plaintiffs.   There was no payment.
There was no absolute promise.   There was no writing.
There was no promise by the plaintiffs to take a lease.
As far as the lessors are concerned, they were never
obliged to execute a lease to the plaintiffs.   What, then, has
the defendant Stiner said or done which gives the plaintiffs
a right which they did not have at the execution of the
lease?   The Stiners were not friendly—were business
rivals, and in the same business.   The defendant Stiner
did not represent the plaintiffs; told them he was doing
business for himself; knew the premises, and would hire
them.   If he knew that the plaintiffs were willing to
accept a lease on the same terms as were granted to him,
he was under no legal obligation to refuse the lease.   He
told no lie.   He suppressed no truth.   He falsely person-
ated no one.   He did not represent himself as acting for
any one but himself.   The lessors were at full liberty to
contract.   He has taken nothing which the plaintiffs had
a right to.   He has taken nothing by any means which
legally makes him a trustee for the plaintiffs.   Assuming
that the owners were mistaken in the defendant Stiner,
that fact gives no right to either the plaintiffs or the own-
ers to annul the lease, if the mistake was not produced by
the defendant Stiner.   That he did not cause the mistake,
if there was one, is found by the court, and the finding is
fully sustained by the evidence.   Joseph Stiner is there-

fore without fault, in law. He is entitled to his lease, and this judgment should be affirmed, with costs.

CARDOZO, J., (dissenting.) It was error to allow the witness Solomon Henriques to answer the question whether Joseph Stiner " assumed to personate the plaintiffs or either -of- them," in his interviews with the landlords. It called for an opinion upon what Joseph Stiner did, instead of requiring the witness to detail what was said and done, leaving to the court to deduce the conclusion. And as the inquiry bore pointedly upon an important branch of the case, namely, circumstances tending to show whether a fraud had or had not been perpetrated by Joseph, we cannot say that the error was of such a character that it could not "have produced injustice in the general result;" and it is only when that can be said, that an erroneous ruling on the trial of a cause on the equity side of the court can be disregarded. (*Forrest* v. *Forrest, 25 N. Y.* 512.) The question to Joseph Stiner himself, whether "he personated" the plaintiffs may be upheld as calling for a fact, and a fact attributed to the witness himself; but the question to Henriques goes much further, and calls upon him to decide upon the point whether what occurred amounted to a personation of the plaintiffs. That was for the court, not for a witness to determine.

But I am not disposed to let my objection to this judgment rest upon a mere question of evidence. I want to put it plainly and distinctly upon the broad ground that the act of which Joseph Stiner was guilty was unholy in the law, and that no matter how adroitly it may have been accomplished, a court of equity, condemning it as a fraud, will treat him as a trustee of the property for the benefit of, and oblige him to transfer it to the plaintiffs. This is a principle of equity jurisprudence so well understood and recognized, that not only is it not necessary to cite authorities to support it, but it was not attempted to be disputed

by the learned counsel who argued for the respondents. Indeed that distinguished gentleman, as might have been expected from one whose views of right and wrong are so accurate, did not hesitate to say that if the evidence on the trial led to the same result, as to the facts, which I reached upon the affidavits when the motion to dissolve the injunction was argued before me, the law as I laid it down in in the brief opinion I then pronounced, was unquestionably correct. I want no better authority in support of my law, and I shall proceed to show that upon the case as developed on the trial at the special term, the facts bring this matter directly within the principles I have mentioned.

The judge, at special term, has found that the lease was executed and delivered to Joseph Stiner under the belief on the part of the lessors that it was to and for the benefit of the person or persons on whose behalf one of the plaintiffs had called upon them at Newburg, and the contrary thereof was not discovered by the landlords for some time thereafter. It is plain, therefore, that by mistake of the landlords the defendant Stiner has obtained what was designed for the plaintiffs; and if he has in any degree misled the landlords into the belief that in giving that lease to him they were doing the same thing as if they were dealing directly with the plaintiffs, then no matter how cunning the artifice to which he resorted, nor how little he did or said to produce that impression, if he did anything for that purpose it was a fraud, and he cannot be permitted to keep the fruits of it, if the plaintiffs elect to treat him as their trustee.

It was not necessary that he should say that he was a member of the plaintiffs' firm. A shrewd man, bent upon getting an advantage like that which Joseph Stiner has taken of these plaintiffs, would undoubtedly avoid announcing, in so many words, that he was perpetrating a fraud. He would very likely say, as he claims he did, that he was not a member of the plaintiffs' firm, but did

business on his own account; but the question is, did he not say something else which led to the mistake of which he seeks to reap the benefit? That he did, and that everything else which has been testified to or found in this case is consistent with the fact that his other statement, to which I shall presently allude, misled the landlords, I think I can easily demonstrate.

When Messrs. Roe and Hasbrouck came to this city, they happened accidentally to call at a store of the defendant Stiner, which adjoined the one kept by the plaintiffs. They were in fact in search of the plaintiffs. When they saw Joseph Stiner, he was informed that he was not the person who had called upon Mr. Hasbrouck at Newburg. Now, that anybody can believe that Joseph Stiner, with that information, and with what transpired at that interview, did not know that his next door neighbors were the persons that had called upon Mr. Hasbrouck, and whom his visitors then sought, is incredible; and whether or not the law called upon him to tell them so, common honesty, as I have before remarked in this case, certainly did. But still, if he did nothing to deceive, perhaps his crime was not cognizable in a human tribunal. It is not necessary to say. But what did he do? He told them that he was not the person that called upon them at Newburg, "*but that they could do the business with him.*" What matters it that he did not personate one of the plaintiffs? What matters it that he told the landlords he was in business on his own account, when at the same time—when admonished that he was not the individual they expected to see—he says, nevertheless, you can do the business with me. Was it not as much as to say, though I tell you I am in business on my own account; though I do not tell you that I am one of the persons who have called upon you; yet I do tell you that you can do the business with me. And is that not as much as to say, it is just the same whether you see them or me? That is why, though Jo-

Stiner *v.* Stiner.

seph Stiner did not personate one of the plaintiffs, the intelligent landlords who dealt with him were misled into the belief that the plaintiffs were getting the lease. Except for that statement, "you can do the business with me," can any one believe that the Messrs. Roe and Hasbrouck, in the face of the fact that Joseph Stiner did not personate one of the plaintiffs, and informed them that he did business on his own account, could have been misled into the belief that they were giving, as the judge has found, a lease to and for the benefit of the person or persons on whose behalf one of the plaintiffs had called upon them at Newburg. Of course Joseph Stiner did not say, I am "Jacob Stiner" or "Mr. Moses" or one of the firm of Jacob Stiner & Co., but he said "that makes no difference, you can do the business with me." By that assertion he misled the landlords into giving to him a lease, believing it was being given to or for the benefit of the plaintiffs. By that assertion he misled the landlords into the belief that he was acting for the benefit of the plaintiffs; and having through that obtained this lease, his attempt to retain it is a fraud which a court of equity should not uphold.

The judgment below should be reversed, and a new trial ordered.

Judgment affirmed.

[First Department, General Term, at New York, January 3, 1871. *Ingraham*, P. J., and *Geo. G. Barnard*, and *Cardozo*, Justices.]